# US DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION-DETROIT

**UNITED STATES OF AMERICA**

        **Plaintiff,**

v.                                        **Case No. 21-cr-20600**
                                                **Hon. Linda Parker**

**DAVID JUDD,**

        **Defendant.**

| UNITED STATES ATTORNEY | AMBERG & AMBERG, PLLC |
|---|---|
| Kelly Warner | James W. Amberg (P68564) |
| Claire Sobczak | Attorneys for Mr. Judd |
| Andres Alemdarez | 32121 Woodward Ave, Ste PH |
| Attorneys for the Government | Royal Oak, MI 48073 |
| 211 W. Fort Street, Suite 2001 | 248.681.6255 office |
| Detroit, MI | 248.681.0115 fax |
| 313.226.9100 office | www.amberglaw.net |

### DEFENDANT'S SENTENCING MEMORANDUM

      Now comes David Judd, by and through his counsel, James Amberg, and respectfully provides the following memorandum in support of a non-custodial sentence.

      David Judd had an idea once long ago when he was working as a case manager for Oakland County Community Mental Health. By that point, his life primarily involved working with the most unfortunate people in society, those with severe mental health issues and living in abject poverty. His idea was born from the things he had himself seen in this world, mainly that most people that could help did not want to. "It was scary to go to a tough neighborhood, you make a lot more money sitting in your office helping people that have private insurance, these people are dangerous." Mr. Judd saw all of this and said to himself that one day

he would start a business where he would go to the toughest neighborhoods, he would work for almost nothing, and he would help the most difficult of mental health patients.  He would do what no other person in his world was willing to do, help those in these fringes of society.

Mr. Judd's idea turned into reality, and he was able to do all the things that he set out to.  But running a business and being a mental health professional are two very different things.  While Mr. Judd was a dedicated and caring practitioner who put his heart and soul into what he did, he was not a good businessperson.  His inability to ensure that his employees properly billed Medicare and Medicaid and his failure to correct these issues once he became aware of them is what results in him being sentenced before the Court.  Mr. Judd's crimes were not based in greed, nor were they done for evil intentions.  Instead, Mr. Judd lost control, became overwhelmed, and did not right the ship when he had the chance.

Mr. Judd's professional life started in a most unexpected way.  He grew up in a poor neighborhood in humble circumstances where he did have difficulties at home.  As a young man, he found himself cutting meat as a profession.  Sensing that this was not the career path he ultimately wanted to walk, Mr. Judd used the money he earned in the decade he worked at the meat cutting facility to put himself through community college and eventually graduated with a psychology degree from Oakland University.

As luck would have it, Mr. Judd's friend worked at Havenwick Hospital and was able to get him a job as a mental health technician.  Mr. Judd hung up his butchers knives and found himself in a career where he was helping people with Schizophrenia.  He would help in all facets of their care, and as a talkative person, would talk to the patients.  He loved this work, and after a few years he moved to Holy Cross Hospital, where he continued the same type of work, only this time with

2

geriatric patients. Many times he was the only person who forged any sort of relationship with his elderly patients during their final years.

Mr. Judd enjoyed the work so much that in 1994 he went back to Oakland University and obtained a degree in nursing. From this, he continued to learn more and more in this field, ultimately resulting in him graduating in 2011 from Wayne State University nurse practitioner masters program. This allowed him to prescribe medicine.

As was mentioned in the beginning of this memo, Mr. Judd eventually took a job at Community Mental Health in Oakland County. In this role he would travel with a psychiatrist to the homes of the people who needed help the most. Mr. Judd's job also placed him at the center of his patient's care in the sense that it was up to him to make sure everything from medical treatment to making sure the patient was fed. Mr. Judd reports that most, if not all, of his patients lived far below the poverty line and suffered from a variety of mental health related issues. Without Mr. Judd, these people likely would not have been able to live with a roof over their heads. Mr. Judd was very passionate about helping these people and decided this would be his life's work.

After receiving his nurse practitioner certifications, Mr. Judd formed his company Life Transitions, of which he built while still employed at Community Mental Health. His company, which essentially consisted of him, would do all of the things that doctors in this field would not, namely go to the tough neighborhoods and see the most down-trodden patients. This business rapidly took off as Mr. Judd built a reputation as a hardworking caregiver who was willing to accept Medicare and Medicaid patients, something that was not economically lucrative.

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

Mr. Judd received many referrals throughout the State. He would find himself helping patients in Detroit, Flint, Pontiac, Grand Rapids, and Lansing. This required a tremendous amount of his time, and he gave it. Mr. Judd worked nearly every day, for long hours. Eventually Mr. Judd hired social workers to help him with treating his patients. As the Court is aware, these employees were dishonest in their medical billings. One of Mr. Judd's crimes is that he failed to rectify the situation financially once he became aware of their fraud.

Part of the reason why Mr. Judd failed to rectify the situation was because his business was chaotic. His employees and third parties billed Medicare and Medicaid with billing codes that many times should not have been used. Mr. Judd was not on top of the billings and should have spent more time understanding the billing codes and when they were appropriate. But turning a blind eye is no excuse and the buck stopped with Mr. Judd. Mr. Judd, realizing his culpability and the effect of his inactions, plead guilty.

Mr. Judd's intent in committing his crime was not to get rich. In fact, he has lived in his girlfriend's two-bedroom house for nearly thirty years. Mr. Judd did not live a lavish lifestyle, he wasn't driving around a Bentley or taking wild vacations to Europe. The money that he made all went back into his company. When he was arrested in this case, he had approximately $650,000.00 that was in his business bank account. Mr. Judd willingly forfeited this money as part of the plea in the case. Further, the total amount of actual loss paid to his company stemming from his crime was $605,701.30, thus the Government has recouped the loss amount.

Mr. Judd's life since his indictment has been very difficult for him. Because of the nature of his charges and plea, it has been nearly impossible for him to find work. In fact, he spends most of his days looking for a job. He tried to work at Walmart and was rejected. He even tried to get a job as a dog groomer and was

4

rejected. Mr. Judd has applied for over 200 jobs, and even though he is literally willing to do any job, none of the potential employers have offered him a chance. This is largely due to his impending sentencing, as what employer would want to hire somebody only for them to be incarcerated.

Professionally, Mr. Judd can never realistically work again in his chosen field. This has been the most devastating part of the case for him. Set aside for a second his crime, the fact remains that our most vulnerable population lost one of the few medical professionals who truly cared. Mr. Judd has suffered permanent professional shame and his life's work has been destroyed. He lives with this every day of his life.

Talking to Mr. Judd is something counsel has done many times during this case. Mr. Judd speaks of nightmares and breaks down when talking about his crime. He talks of deep regret at what happened, how he wishes he could go back and be a better business owner. When brought up by counsel, Mr. Judd wholeheartedly agreed that he never should have been running a business and instead should simply have worked at a company. Had he done so, he would likely be helping patients right now instead of getting ready for a sentencing on a Federal criminal conviction.

### The 18 USC 3553(A) Factors

The goal of federal sentencing is to impose a sentence that is sufficient, but not greater than necessary based on the circumstances. *US v Kimbrough*, 552 US 85, 92-93 (2007), citing 18 USC §3553(a) USC §3553(a) provides seven factors that the Court should review in order to impose a sentence that is "sufficient, but not greater than necessary." These factors are:[1]

---

[1] Instead of regurgitating the lengthy 3553 factors, counsel for Mr. Judd paraphrases the key issues

5

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established;

(5) any pertinent policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

**Nature and Circumstances of the Offense and History and Characteristics of Mr. Judd**

Mr. Judd's case involved unlawfully billing Medicare and Medicaid. Mr. Judd certainly recognizes why this is a serious matter, as stealing from these Governmental programs affects the very people that Mr. Judd cares about most, the people at the edge of society that have mental health issues and are the most vulnerable. That being said, Mr. Judd's crime was not one with an evil basis. He did not turn a blind eye because he was making so much money. He wasn't ripping off Medicare to pay for a yacht. He did his crime because he was overwhelmed, unsupervised, chaotic, and was not up to the level of responsibility necessary to run a company that took off far too fast for one person to handle.

Mr. Judd is a good person. He lived a life of hard work and helped many people along the way. He chose the path of helping the less fortunate rather than

making far more money in some cushy office job. Mr. Judd made some very poor decisions in the case, but he also has great remorse for his actions. Outside of this he has never been in trouble. He lived and continues to live a modest life. His hopes are to finish his obligations in the case and get a job.

**A Noncustodial Sentence Will Adequately Protect the Public, Deter Others, Reflect the Seriousness of the Charge, and Provide Mr. Judd with Rehabilitation**

Although Mr. Judd's crime was very serious, what has happened to him will deter any other provider who chooses not to report fraud. Even though changing codes might seem to be less serious than other crimes, the reality is that Mr. Judd's decisions regarding this resulted in the end of his business and profession. As to rehabilitation, Mr. Judd would benefit from outpatient counseling and would otherwise be a prime candidate at rehabilitation.

**Age Policy Statement**

§5H1.1 discusses age as a possible reason to depart below the guidelines, imploring that "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." Mr. Judd is 71 years old. Incarcerating him at his age would likely result in added medical bills and care that a younger inmate would not incur. This means that the taxpayer is on the hook. It would be far less costly to have Mr. Judd sentenced to home confinement.

**Record of Prior Good Works Policy Statement**

§5H1.11 instructs that "Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." This statement has been used to justify a downward departure in cases such as Judge Lawson once finding that "the

7

Court finds that it may depart downward in this case if it determines that the defendant's charitable contributions and involvement in the community, including his continuous employment history in the public sector, are sufficiently unusual and outside the heartland of cases to warrant such a departure and involved a significant contribution of the defendant's time, personal skill, and personal involvement." *United States v Kuhn*, 351 F Supp 2d 696, 705 (ED Mich 2005)(internal citations omitted)  Judge Roberts once held that "employment history alone or coupled with other factors may justify a variance from the Guidelines." *United States v Holden*, No 06-20345, 2007 WL 1712754, at 3 (ED Mich June 13, 2007)

It is argued that Mr. Judd's prior history of decades of being a good provider to our most vulnerable populations is something that the Court could base a downward departure on.  Mr. Judd was no ordinary provider, he went where no one else would, to help those that most providers shunned.  He worked for less money in what is believed to be far worse conditions because he cared more about the people he was helping than increasing his bottom line.  For many years he helped people whom are extremely difficult to help, likely resulting in the saving of many lives.

**Character Letters**

Mr. Judd has attached a number of letters that speak regarding his positive attributes.  First is a letter from Tristan Mora, who worked at Life Transition Services from 2018-2022.  Ms. Mora speaks highly about Mr. Judd's enthusiasm in his job and her experiences hearing the gratitude of the many people that he helped over the years.  Pharmacist Clyde Furuta describes Mr. Judd as somebody who continued to care for his patients even after he was no longer allowed to bill for his services.  This speaks volumes about who Mr. Judd is.

8

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

Early in this case, Mr. Judd moved for the Court to allow him to continue to bill Medicare and Medicaid for his services because of the concerns of patients not having any other provider available to help fill the void of Mr. Judd not working. Although this request was ultimately denied, counsel was able to gather letters from different individuals who stated Mr. Judd's importance to helping his patients at the time. These letters are also attached and speak to Mr. Judd's positive character regarding his providing good care to his patients.

## Conclusion

Mr. Judd requests the Court sentence him to supervised release. He does not make this request lightly. In the world of Medicare fraud, most violators do it for the money. Mr. Judd did not. Mr. Judd committed his crime by failing to do the right thing when confronted and failing to ensure his bills were done lawfully. Although there is no legal excuse for these poor decisions, it is argued that his remorse, life change, lack of criminal history, and that the taxpayers were able to recoup their losses all weigh in favor of a non-custodial sentence.

It is requested for these reasons that the Court depart below the Guidelines and sentence Mr. Judd to a non-custodial sentence.

                                    Respectfully submitted,

                                    /s/*James W. Amberg*
                                    AMBERG & AMBERG, PLLC
                                    James W. Amberg P68564
                                    Attorneys for Mr. Judd
                                    32121 Woodward Ave. Suite PH
                                    Royal Oak, MI 48073
                                    248.681.6255
                                    248.681.0115 (fax)

Dated: October 15, 2024

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

### *Certificate of Service*

      I, James W. Amberg, attorney at law, certify that on October 15, 2024, I caused a copy of this Motion to be served upon the Clerk and the Government via ecf.

                                          /s/ *James W. Amberg*
                                          James W. Amberg (P68564)

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

# CHARACTER LETTERS

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

11

# Tristan L Mora

Phone: (313) 578 1413 ● E-Mail: tristan.leslie.m@gmail.com

June 30, 2024

To Whom It May Concern,

I have known David Judd since 2017 and was employed by him at Life Transition Services, a primarily mobile psychiatric practice, from 2018-2022. During that time I found Mr. Judd to be both a caring employer and healthcare provider.

As an employer Mr. Judd was professional as well as enthusiastic about his business. He was always willing to teach his staff anything they were interested in learning, even beyond what was necessary as administrators. He shared his knowledge of psychiatric disorders, the science of diagnosing and prescribing, and could talk for hours about the impact of lack of accessibility to mental healthcare on the community's most vulnerable patient populations. He was demonstrably passionate in his mission to provide a higher quality of psychiatric care than what was widely available to the greatest number of patients possible, and ensured his administrative staff were equipped to support that vision.

In my time at Life Transition Services I witnessed David Judd prioritize the wellbeing of his patients above everything else. From spending extra time with individuals who needed care beyond the scope of a routine follow up appointment even when it extended his working day, to performing case management and coordination of care for people who lacked support or resources outside of appointments, to delivering turkeys on Thanksgiving Day to assisted living facilities–Mr. Judd consistently put his patients first in his life.

Over the years I heard patients, their family members, and care home managers express gratitude for the time and attention to detail Mr. Judd offered as a psychiatric provider. He was willing to treat patients in their homes when they lacked transportation due to disability, lack of transportation, or other circumstances that would otherwise preclude them from access to mental healthcare. Mr. Judd always emphasized treating his patients with patience, dignity, and respect, and to his office staff and colleagues his love of his career was evident.

From all that I observed, David Judd made a positive impact on his staff, his patients, and the community in which he worked.

Thank you,


Tristan Mora

<u>To</u> Whom It May Concern:

From both a business and patient perspective, our relationship with David Judd, NP., was a positive one—as it was and is with most prescribers.  Much of his practice with our pharmacy involved group homes, many of which house lower income or even indigent, psych patients. Many have no consistent means of being seen as in-office patients due to limited transportation or little to no means of communication. And, sadly, they just aren't responsible enough to keep appointments.  Therefore, having a practitioner like David Judd visiting the homes was a very meaningful solution.

David was very consistent and thorough in his approach. Often he would call our pharmacy to gather whatever pertinent information we had regarding a new patient.  Many times we had little or nothing, but there were also times when we did have a detailed med profile. Sometimes it was not as current as one would like, but there was a history, which is always helpful.  Often, with the patients' approval, David would include us as a third party in a phone conversation dictating verbal scripts and confirming timelines.  Then the patient would know exactly what meds they would receive and when they would receive them.  David's method, care, and concern were very effective.

David's phone inquires with standing patients were also a helpful tool.  He would often check on refill consistency for adherence issues.  If there was an apparent utilization issue, he would address it with the patient, right then and there.  We, as the pharmacy, could notate and make adjustments immediately.  If this involved medication modifications or additions, the patient would get them in a very timely manner, since we offer a home delivery service.  This became a very effective process for the prescriber and for the patients—it surely helped in keeping them stable.

Psychotropic injection medications, although they can be very effective therapy, often present administration constraints  Many patients who are well-controlled on monthly or even longer-acting psych meds may have barriers when it comes to self-administering these injectables. David was one of the few prescribers who would revisit his sites to inject the meds into those patients.

Prescribers like David Judd use many different pharmacies.  Our company appreciated the business and accordingly did our best to fulfill our responsibilities to him and to the patients. We felt his knowledge and background as a practitioner was noteworthy.  He rarely went astray with his prescribing habits which made our staff feel assured that he was taking care of the patients responsibly.  David continued caring and prescribing for his patients, as long as was legally able to do so, even when he couldn't bill for his services.  We feel that is commendable.

Respectfully,
Clyde Furuta, RPh., Partner LTCMedex Direct & CareRx Specialty Pharmacy, LLC.,
       (b)877-899-6337/800-267-0352  (c)586-405-6551

.To Whom It May Concern,                                                                                          October 20,2021

Mr. David Judd has provided medication management with psychiatric prescriptions, injections and crisis interventions for 50+ clients over the last several years after being referred by the local hospitals and county programs needing follow-up for ineligible clients for other referrals. As a caregiver, I have to cite the following problems as current issues for clients needing psyche help in SE Michigan:

1. Lack of licensed psychiatrists
2. Lack of acceptance of various government sponsored insurances.  Providers are not accepting many.
3. County services denied for many; especially for those just leaving hospital setting but yet are still chronically mentally-ill over their lifetime needing consistent med management and monitoring to reduce recidivism, self-harm, criminal activities, missing persons, harm to others and death.  We have little long-term in-patient settings or real help at all.  Our mentally-ill are suffering as it is.  Vulnerable and forgotten, unfortunately.
4. Not all clients have benefits including transportation services.  A few dollars over the State's threshold will cut Medicaid coverages enabling transportation.  An in-home visiting physician negates the need for all this and assures their attendance and co-operation.
5. Clients do not have the comprehension or stability to keep appointments.  Low income without additional paid supervision to safely transport both ways.
6. Isolation and unsure scenarios due to Covid-19 and restrictive mandates.  Causing increased anxiety, depression, substance abuse and psychosis.

Due to these issues and more; we are struggling to maintain stability and med management for numerous clients.  My peers in caregiving are now struggling as well that utilized Mr. Judd's services.  We need injections for our clients each month (28 days) and medications prescribed with monitoring.  We are not doctors, only the caregivers caught in the middle of the lack of mental health help.  Hospital visits are going to compound without help in place.  Recidivism will quadruple and mental health wards of this state will suffer without question without this help.

None of us are privy to his circumstances, but are in need of his services as we scramble to find replacement services for our most vulnerable.

                                                                                                                  Sincerely,

                                                                                                                  Bobbie Christian

Elizabeth Edgar
10382 Denton Hill Road
Fenton, MI 48430
lizedgar47@gmail.com


October 20, 2021


To Whom It May Concern:

Re: David Judd, NP
Lifestyle Transitions

I have known David since 1995, perhaps sooner. We have worked together for years. I will certainly vouch for the fact that David has taken care of the residents I had at Grovecrest better than anyone else that I have worked with.
I was in Healthcare from 1984 until January of this year. I was in a nursing home, worked in a home for MORC then went to Grovecrest in September of 1992. I have dealt with a lot of Doctors and other individuals dealing with Mentally handicapped individuals.
When I needed David, he came. Injections were scheduled and he came. I could call him 24 hours a day and I received the help I needed for my residents whether it was for a much needed visit, a visit after a hospitalization and meds had been changed, someone was having a breakdown, or they just wanted to see him.
He is much needed in this capacity and he works many hours a day. There is absolutely no one else out there that can provide these services as David does.
Thank you for allowing me to share my experiences with you.


Sincerely,
Liz Edgar
Former Administrator
Grovecrest Senior Care

HAVEN ADULT FOSTER CARE LTD.<br>
73600 CHURCH ST.<br>
ARMADA, MI 48005<br>
586-727-2175

October 19, 2021

To whom it may concern:

David Judd, Mental Health Nurse Practitioner has been the company's provider for a little over 5 years. He has been able to manage all his patients' medications with the lowest hospital rate the company has every had. He communicates with all staff members, onsite RN, and managers with each visit. There are several patients that are on injections, he helps the guardian to keep the cost of these medications down along with keeping the cost of unnecessary hospital visits for behavior problems.

It is difficult to find psychiatric providers in our area. We have not been able to find any other provider that will come and do onsite visits for all our clients. Dave is available to us 24/7 and handles his patients needs at any time. We value our relationship with him and the relationship he has with his patients.

Thank you


Stacy Conn, Manager

# St. Joseph Manor HFA LLC

4800 Cadieux Rd
Detroit MI, 48224
(313) 882-3800

September 30, 2021

To Whom It May Concern,

My name is Farrukh Moghul and I am the owner of St Joseph Manor HFA LLC, located at 4800 Cadieux Rd, Detroit MI 48224. In January of 2018 I began referring residents at my facility to David Judd, M.S.N PMHNP-BC, for psychiatric evaluation, medication management, and brief therapy. Under the care and attention of Mr. Judd, eligible residents at my facility received necessary interventions in the form of pharmaceuticals, including long-acting injections, and support for the treatment of life-threatening psychiatric disorders. There are very few psychiatric providers who are able to perform these services in the home, and without the continuing care of Mr. Judd, his patients at St Joseph Manor may be at high risk of relapse.

Sincerely,

*[signature]*

Farrukh Moghul